*819 OPINION OF THE COURT
Ralph A. Fabrizio, J.
This case deals with the general question of what mens rea is required for the commission of aggravated unlicensed operation of a motor vehicle in the second degree (Vehicle and Traffic Law § 511 [2] [a] [iv]), and the specific question of whether the People have presented legally sufficient evidence at trial to demonstrate that mens rea and thereby defeat the defense motion to dismiss at the close of the People’s case.
The defendant is before the court on a nonjury trial, charged with a violation of Vehicle and Traffic Law § 511 (2) (a) (iv), aggravated unlicensed operation of a motor vehicle in the second degree. The People have alleged that the defendant was operating a motor vehicle, and that at the time he was stopped by the police, his license had been suspended a total of 57 times based on tickets he had been issued on 16 separate dates. The People called three witnesses, including an employee of the New York State Department of Motor Vehicles, and rested. The defense presented no evidence and also rested. The defense moved, pursuant to CPL 290.10 (1), to dismiss at the close of the People’s case, and renewed that motion at the close of trial. The defense argued, inter alia, that the People have failed to establish a prima facie case that the defendant knew or had reason to know not only that his license was suspended or revoked, but also that he knew or had reason to know that he “ha[d] in effect three or more suspensions, imposed on at least three separate dates, for failure to answer, appear or pay a fine.” (Vehicle and Traffic Law § 511 [2] [a] [iv].) The court reserved decision on each of those motions.
After the charge conference, the court directed the attention of the parties to the criminal jury instruction for Vehicle and Traffic Law § 511 (3) (a) (ii) (CJI2d[NY] Vehicle and Traffic Law § 511 [3] [a] [ii]),[1] a charge based on a statute worded in an identical manner to the statute at issue in this case, and thereafter informed the People and defense counsel that the court would render a decision on the defendant’s motion to dismiss before deliberating. After reviewing the extensive memoranda prepared by both sides, the defendant’s motion to dismiss at the close of the People’s case is denied.
A court may issue a trial order of dismissal at the close of the People’s case or at the conclusion of all the evidence “upon the *820 ground that the trial evidence is not legally sufficient to establish the offense charged therein or any lesser included offense.” (CPL 290.10 [1] [a].) “A motion for a trial order of dismissal may be granted where the trial evidence, if accepted as true without considering questions as to the quality or weight of the evidence, is legally insufficient to establish every element of the offense charged.” (People v Sala, 258 AD2d 182, 188 [3d Dept 1999], affd 95 NY2d 254 [2000], citing People v Sabella, 35 NY2d 158, 167 [1974].) In this case, the threshold question involves a determination of the mens rea elements of Vehicle and Traffic Law § 511 (2) (a) (iv). At issue in this motion is not only whether the People have established a prima facie case of the defendant’s guilt, but what elements are needed to establish that prima facie case.
Vehicle and Traffic Law § 511 is entitled “Operation while license or privilege is suspended or revoked; aggravated unlicensed operation.” Vehicle and Traffic Law § 511 (1) provides that
“(a) A person is guilty of the offense of aggravated unlicensed operation of a motor vehicle in the third degree when such person operates a motor vehicle . . . while knowing or having reason to know that such person’s license or privilege of operating such motor vehicle in this state or privilege of obtaining a license to operate such motor vehicle ... is suspended, revoked, or otherwise withdrawn.”
The statute at issue here is Vehicle and Traffic Law § 511 (2) (a) (iv). A person is guilty of that misdemeanor “when such person commits . . . aggravated unlicensed operation of a motor vehicle in the third degree . . . and . . . (iv) such person has in effect three or more suspensions, imposed on at least three separate dates, for failure to answer, appear, or pay a fine.”
There is no question that the People must establish that the defendant knew or should have known that his license was suspended. (People v Pacer, 6 NY3d 504, 508 [2006].) Relying on People v Ryan (82 NY2d 497 [1993]), the defense argues that the manner in which the Legislature drafted Vehicle and Traffic Law § 511 (2) (a) (iv) mandates that the People demonstrate not only that he had knowledge that his license was suspended, but also that he knew or had reason to know that it had been suspended at least three times on three or more separate occasions. Citing People v Pabon (167 Misc 2d 214 [Crim Ct, Bronx County 1995]), the People argue that recognized rules of statu *821 tory construction mandate that they prove only that defendant had knowledge that his license was suspended on at least one occasion, and that the Legislature did not mandate that the People establish that the defendant had actual or constructive knowledge that his license had been suspended three or more times on three or more separate dates.
In light of Pacer, the Committee on Jury Instructions of the Office of Court Administration has recently drafted a charge relating to Vehicle and Traffic Law § 511 (3) (a) (ii), aggravated unlicensed operation of a motor vehicle in the first degree, a felony. That instruction requires the People to prove beyond a reasonable doubt, inter alia, that a defendant knew or had “reason to know that he/she had in effect ten or more suspensions imposed on at least ten separate dates” (CJI2d[NY] Vehicle and Traffic Law § 511 [3] [a] [ii]). If Vehicle and Traffic Law § 511 (2) (a) (iv) is construed in the same manner, the trier of fact would have to find that the defendant knew or had reason to know that he had in effect three or more suspensions, imposed on at least three different dates in order to render a verdict of guilty in a case charging a violation of this statute. In fact, the People and defense both agree that the instruction appears applicable, with modification, to this case. However, the People argue that the instruction incorrectly sets forth the mens rea element; the defense takes the opposite position. So a subsidiary question is whether this Criminal Jury Instruction represents an accurate statement of the mens rea element of Vehicle and Traffic Law § 511 (2) (a) (iv).
In interpreting the meaning of a statute, a court should always look first to the words of the statute itself. (Ryan, 82 NY2d at 502.) Where “the statute is clear on its face it is probably unnecessary to consider the legislative history” behind the statute, including any amendments. (Giblin v Nassau County Med. Ctr., 61 NY2d 67, 74 [1984].) In this case, the People urge that the words the drafters used in enacting Vehicle and Traffic Law § 511 (2) (a) (iv) indicate an intent to have no mens rea required in connection with the element that the defendant have three or more license suspension orders issued on at least three separate dates.
Penal Law § 15.10 provides in pertinent part that
“[t]he minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is physically capable of perform *822 ing. . . . [I]f an offense or some material element thereof does not require a culpable mental state on the part of the actor, such offense is one of ‘strict liability.’ ”
A statute or a material element can be interpreted to be one of strict liability where the specific words chosen indicate a clear legislative intent to do so. (See Penal Law § 15.15 [2].) The Legislature has provided guidance about how to interpret a statute with respect to the mental culpability for the commission of a crime. Thus, where a statute requires a culpable mental state, such as knowingly, and “one and only one of such terms appears” in that statute, that term “is presumed to apply to every element of the offense unless an intent to limit its application clearly appears.” (Penal Law § 15.15 [1].)
Here, the legislative intent to make knowledge an element of Vehicle and Traffic Law § 511 (1) is clear. The statute requires that the defendant can be found guilty only if he knew or had reason to know that his license was suspended or revoked. And that same knowledge element is present in Vehicle and Traffic Law § 511 (2) for crimes designated as aggravated unlicensed operation of a motor vehicle in the second degree. The quandary presented is whether the Legislature intended the knowledge element to carry over to the aggravating factor present in clause (iv) of Vehicle and Traffic Law § 511 (2) (a).
In looking to the language of the statute itself, it would appear that was not the Legislature’s intent. Rather, it would appear that the Legislature intended that the aggravating factor in clause (iv), that the defendant had in effect three or more suspensions imposed on at least three separate dates, be one of strict liability, therefore not requiring the demonstration of a specific mens rea that the defendant was aware or should have been aware that his license had been suspended on three or more separate occasions.
This conclusion is supported by reading some Penal Law statutes that are worded in nearly identical manner. One such statute is Penal Law § 165.45 (2), criminal possession of stolen property in the fourth degree. There, a defendant is guilty when he or she “knowingly possesses stolen property . . . and when: ... 2. The property consists of a credit card.” In People v Mitchell (77 NY2d 624 [1991]), the Court interpreted the “credit card” element as an aggravating factor which the Legislature intended to impose without the requirement of an attendant culpable mental state. In interpreting the statute, the Court *823 recognized that “[t]he unmistakable effect and location of the adverb ‘knowingly’ is to pinpoint the primary culpable mental state component only on the criminal possessory act . . . [but] not . . . arc over to the particular aggravating characterization of the property stolen.” (Id. at 626.)
The statute at issue in Ryan was worded quite differently. There, the Legislature provided that the defendant was guilty of criminal possession of a controlled substance in the second degree “when he knowingly and unlawfully possesses: ... 5. six hundred twenty-five milligrams of a hallucinogen.” (Ryan, 82 NY2d at 501.) Given the particular wording of this statute, the Court could “discern no ‘clear’ legislative intent to make the weight of a drug a strict liability element.” (Id. at 503.) The Court made this finding, in part, because “the knowledge requirement carrie [d] through to the end of the sentence” defining the crime. (Id. at 502.) Thus, under that statute, a defendant would be guilty only when the People proved that the defendant had knowledge that he possessed a controlled substance and also proved that he had knowledge of the weight of that substance.
In 1995, the Legislature redrafted article 220, possession of controlled substances crimes, to eliminate the requirement that the defendant have knowledge of the weight of the substance. They did so, in part, by rewording the statutes. Thus, a defendant is now guilty of criminal possession of a controlled substance in the second degree “when he or she knowingly and unlawfully possesses: ... 5. a hallucinogen and said hallucinogen weighs six hundred twenty-five milligrams or more.” (Penal Law § 220.18 [5] [emphasis added].) By the simple insertion of the word “and,” the Legislature indicated its intent to hold the defendant liable under this statute for knowing possession of an amount of a hallucinogen whose weight exceeded 624 milligrams, without requiring that the People prove that the defendant had knowledge of that weight.
Here, the statute at issue is written in a strikingly similar way to Penal Law § 165.45 (2) and the post-Ryan Penal Law § 220.18 (5). Vehicle and Traffic Law § 511 (2) has the knowledge requirement directly attached only to one element, namely, that the defendant knew or had reason to know that his license was suspended pursuant to Vehicle and Traffic Law § 511 (1). There are four aggravating factors listed, one of which must be established to prove the defendant guilty of that crime. Those aggravating factors follow the insertion of the word “and.” One *824 would think that “[i]f the Legislature had intended that the People must prove a culpable mental state in relation to the aggravating factor[s], it could have done so simply by direct expression.” (Mitchell, 77 NY2d at 627.) In fact, several courts have found that the fact that the Legislature chose not to include such language in clause (iv) of Vehicle and Traffic Law § 511 (2) (a) would indicate that the People only have to plead that a defendant knew that his or her license had been suspended or revoked on one occasion in order to have a facially sufficient accusatory instrument, and the fact that the defendant’s license was suspended three or more times are “strict liability” elements not requiring an allegation that the defendant knew or should have known that his or her license was suspended three or more times. (See e.g. People v Clinkscales, 3 Misc 3d 333 [Nassau Dist Ct 2004]; Pabon, 167 Misc 2d at 216-217; see also People v Kleiner, 174 Misc 2d 261, 267-268 [Sup Ct, Richmond County 1997]; but see People v Garcia, 163 Misc 2d 862, 866 [Crim Ct, Bronx County 1995].)
In 2004, however, the Legislature threw what might be considered to be a monkey wrench into this analysis when it amended Vehicle and Traffic Law § 511 (3) (a) (ii). The original statute, enacted in 1993, provided that a defendant was guilty of this crime when that person “is operating a motor vehicle while such person has in effect ten or more suspensions, imposed on at least ten separate dates” (Vehicle and Traffic Law former § 511 [3] [a] [ii]). There was no requirement in that statute that the People also prove the defendant guilty of Vehicle and Traffic Law § 511 (1). By NY Senate Bill S 426, in chapter 673 of the Laws of 1994, the Legislature amended the statute to read as it does today. The current statute provides that the defendant is guilty of Vehicle and Traffic Law § 511 (3) (a) (ii) when that person “commits the offense of [Vehicle and Traffic Law § 511 (1)]; and is operating a motor vehicle while such person has in effect ten or more suspensions, imposed on at least ten separate dates.”
Once again, the intent of the Legislature appears to be clear from the plain language of the statute. One would think that to make out a prima facie case of a violation of this statute, the People would have to introduce legally sufficient evidence to show that the defendant knew or should have known that his or her license was suspended, and that the existence of 10 of more separately issued license suspensions is an aggravating factor, and one of strict liability, not requiring the demonstration of a *825 mens rea. But, the criminal jury instruction states otherwise. And this has led to an examination of the legislative history of the 2004 amendment. This appears to be one of those rare cases where “ ‘aid to construction of the meaning of words, as used in [a] statute’ ” present in published legislative history should be examined. (New York State Bankers Assn. v Albright, 38 NY2d 430, 437 [1975], quoting United States v American Trucking Assns., Inc., 310 US 534, 543-544 [1940].)
The New York State Senate’s Memorandum in Support of the 2004 bill notes that its purpose is to make “a technical correction ... to clarify the elements of” Vehicle and Traffic Law § 511 (3) (a) (ii) (Mem in Support, 2004 McKinney’s Session Laws of NY, at 2130). The justification for the bill is stated as follows:
“The intent of the legislation passed was that the felony of aggravated unlicensed operation of a motor vehicle would be committed when the defendant operated a motor vehicle with knowledge or reason to know that he or she had more than ten outstanding suspensions. The legislation which was signed into law, due to a technical error, appears to have eliminated the knowledge requirement. This was not the intent of the sponsor and therefore this correction is required.” (Id.)
Both Vehicle and Traffic Law § 511 (2) (a) (iv) and (3) (a) (ii) were initially enacted as part of chapter 607 of the Laws of 1993. The Memorandum of the Legislative Representative of the City of New York notes that it would make “the persistent scofflaw (i.e. one with three or more suspensions for failure to answer a summons issued by the Commissioner of Motor Vehicles on separate dates)” subject to prosecution as a “serious misdemeanor.” (1993 McKinney’s Session Laws of NY, at 2701.) That memorandum makes no mention of whether the People had to demonstrate that the “persistent scofflaw” had knowledge of the number of suspensions involved in order to be guilty of the misdemeanor. The Memorandum of Governor Mario Cuomo, issued in approving the 1993 statute, notes that the bill was meant to address “[t]he dangers posed by unlicensed drivers to pedestrians and other motorists” as well as “[t]he proliferation of drivers in New York City with multiple license suspensions” by increasing “penalties in order to remove these drivers from the roads” and “making jail terms possible for initial offenses.” (1993 McKinney’s Session Laws of NY, at 2914.) That *826 memorandum, understandably, makes no mention of whether a motorist accused of driving with multiple license suspensions needed to know or had reason to know of the requisite number required in order to be guilty of the particular aggravated crime involved.
These two statutes are clearly in pari materia, since they relate to the “same matter or subject.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 221, Comment.) Sometimes, “[a] subsequent act in pari materia may aid in determining the legislative intent of an earlier statute or section; and, where such is the case, it should be considered, though it is not considered decisive.” (Statutes § 223, Comment.) In this case, it appears that the legislative memorandum issued in connection with the amendment to Vehicle and Traffic Law § 511 (3) (a) (ii) “furnishes some evidence as to the legislative intent” (Statutes § 223, Comment), behind the enactment of the statutes criminalizing aggravated unlicensed operation of a motor vehicle enacted in 1993, including Vehicle and Traffic Law § 511 (2) (a) (iv). In order to infer that it does provide guidance, a court must be able to conclude with clarity “that in its passage the legislative body had in mind the earlier act and its purpose.” (Statutes § 223, Comment; People ex rel. Bockes v Wemple, 115 NY 302, 309 [1889].)
Vehicle and Traffic Law § 511 (2) (a) (iv) and (3) (a) (ii) were both introduced as part of chapter 607 of the Laws of 1993. At the same time, and in the same session, the Legislature also passed chapter 606 of the Laws of 1993. Included in chapter 606 were amendments to other statutes involving unlicensed operation of motor vehicles, including adding a misdemeanor called facilitating aggravated unlicensed operation of a motor vehicle in the second degree, Vehicle and Traffic Law § 511-a (3) (b). That statute provides that an individual is guilty of that crime, inter alia, when that person “consents to the operation upon a public highway of a motor vehicle registered in such person’s name knowing or having reason to know that the operator of such vehicle is a person who has in effect three or more [driver’s license] suspensions, imposed on at least three separate dates” (Vehicle and Traffic Law § 511-a [3] [b]). So, clearly, by unambiguous language, the Legislature mandated that the person charged with this crime had to “know or have reason to know” that the person he or she gave permission to drive his or her vehicle had in effect at least three or more separately issued license suspensions. This statute is also in pari materia with Ve *827 hiele and Traffic Law § 511 (2) (a) (iv). Indeed, the aforementioned Governor’s Memorandum was issued in conjunction with the approval of both chapters 606 and 607.
In drafting the statutes, however, the Legislature chose to include an additional and specific mens rea requirement for misdemeanor facilitating the aggravated unlicensed operation of a motor vehicle. Prior to that time, the only statute involving a similar offense was a traffic infraction. The 1993 amendments to the existing statutes were aimed at creating criminal penalties for “disreputable owners of registrants of for-hire vehicles, tow trucks and taxi cabs, for example.” (Mem of Assemblyman Daniel L. Feldman in Support of L 1993, ch 606, 1993 NY Legis Ann, at 470-471.) Significantly, “the restructuring of the penalties is modeled after the penalty structure for the crime of aggravated unlicensed operation of a motor vehicle” contained in the companion legislation enacted at the same time. (Id.) The sponsor of the bill noted that “nearly 60% of the worst scofflaws in New York City are driving cabs and gypsy taxis” and that “livery drivers with multiple suspensions [had been] involved in fatal accidents involving young children.” (Id.) The sponsor further noted that the individuals who own and register these vehicles have “responsibilities” to the public, but that their “profits outweigh[ed] the [then] current penalties associated with the offense and the registrants continue to disregard the law.” (Id.)
It is apparent that in 1993, when the Legislature created criminal penalties for offenses involving individuals who drive cars with multiple suspensions, that they chose to hold the person who allowed such a driver to use their car criminally liable only where the individual knew or should have known of the existence of the multiple suspensions by inserting clear, unambiguous language. At the same time, they criminalized the actions of the drivers who drove with suspended licenses. But in enacting clause (iv) of Vehicle and Traffic Law § 511 (2) (a), they did not include the same language that they had used when drafting Vehicle and Traffic Law § 511-a (3) (b). Simply put, they chose not to insert the word “knowing” into clause (iv) of Vehicle and Traffic Law § 511 (2) (a), as they did with Vehicle and Traffic Law § 511-a (3) (b). And they still chose not to do so when they amended Vehicle and Traffic Law § 511 (3) (a) (ii) in 2004. Thus, there is no reason that this court can conclude with any clarity that the 2004 amendment was in any way meant to impose retroactively a mens rea requirement in connection with *828 clause (iv) of Vehicle and Traffic Law § 511 (2) (a). Accordingly, the court relies on the tried and true method of statutory interpretation, examines the plain words of the statute, and finds that the People must establish that the defendant had or should have had knowledge of the fact that his license was suspended or revoked, and demonstrate only that three or more separately issued suspension orders were in effect at the time he was operating a motor vehicle, in order to make out a prima facie case of a violation of Vehicle and Traffic Law § 511 (2) (a) (iv).[2]
That does not end the inquiry, however, because the defendant argues that the People have failed to present legally sufficient evidence that he knew or should have known that his license was in fact suspended or revoked at the time of the crime. Reading the evidence in the light most favorable to the People, they have presented evidence that is legally sufficient to establish this element.
During the trial, a police officer testified that, on October 25, 2005, in the Bronx, he observed the defendant driving a car with a broken headlight. The defendant presented a New York State driver’s license, which the officer testified appeared to be valid and unexpired. The officer checked the status of defendant’s license over a police radio, and was informed that the defendant’s license was in fact suspended. The defendant was arrested and charged with aggravated unlicensed operation of a motor vehicle.
The People also called Kimberly Shaw, a customer service representative from the New York State Department of Motor Vehicles (DMV). Ms. Shaw has been employed at DMV for about 4x/2 years, beginning in 2002. Her duties include issuing driver’s licenses, permits, and registrations, as well as reviewing driving abstracts and suspension records. Ms. Shaw identified the defendant’s driving abstract, and the People laid the proper foundation for its introduction as a business record. The abstract indicates that, at the time of the defendant’s arrest, his driver’s license had in fact been revoked. The summary of suspensions and revocations indicates a total of 61 in effect at the time defendant was arrested, with 57 “scoffs” on 16 “dates.” A “scoff” or “scofflaw” is “a suspension because of tickets.” The abstract details that the suspensions occurred based on summonses issued to the defendant between October *829 8, 1983 and August 1, 1994. There are separate suspension order numbers listed for each of the suspensions noted on the abstract.
According to Ms. Shaw, the driving abstract also shows that the defendant surrendered a New York State driver’s license to the State of Pennsylvania on September 27, 1996. Ms. Shaw could not state that the New York license surrendered was valid at the time because the DMV records of “some states are linked with New York and some are not.” About 10 months later, on July 29,1997, the abstract indicates that the defendant returned the 1996 Pennsylvania license to New York and “traded it for a New York license.” It further shows that, some 13 months later, on November 8, 1998, the defendant once again surrendered a New York State driver’s license to Pennsylvania. He returned a Pennsylvania driver’s license to New York on March 14, 2001. An “image capture,” the photograph taken of the defendant when he applied for the New York State license that day as well as the signature used by the defendant, was properly authenticated and introduced into evidence as a business record. It is unquestionably a photograph of the defendant. However, the signature is in the name “Eddie Melendez.”
On November 30, 2001, the abstract indicates that the defendant once again surrendered his New York State driver’s license to an unknown source, and that on July 21, 2004, “he did a reciprocity from Pennsylvania.” Ms. Shaw testified that this meant he once again “gave us a Pennsylvania license in order to get a New York license” on that date. Another image capture was authenticated and properly introduced through Ms. Shaw as a business record relating to the issuance of the New York State driver’s license on that date. Once again, the photograph clearly depicts the defendant. The signature is now in the name “Eddie Abelo.”
Ms. Shaw also identified a document entitled “driver’s license suspension order” in the name “Eddie Abelo.” It was addressed to the defendant at a location in Brooklyn. Ms. Shaw authenticated the document as a business record, and stated that it was still kept in the regular course of business of the New York State Department of Motor Vehicles. The suspension order is dated December 19, 1992, and advises the defendant that his license will be suspended on January 4, 1993, for failing to appear and answer a summons. She testified that “a driver’s license suspension order is a paper that is sent to a motorist when their license is about to be suspended.” Ms. Shaw testi *830 fled about the present practices in place for generating, issuing, and mailing suspension orders. She also testified that the procedures in existence in 1992, when the document was generated, required that the order be mailed to the address of the motorist that was then on file with the Department of Motor Vehicles.[3] The same suspension order number appears on the abstract, and notes that the defendant’s license was in fact suspended on January 4, 1993 for failing to answer a summons.
Following the introduction of that document into evidence, the People attempted to introduce three additional documents referred to as notices of suspensions from 1993. During voir dire questioning in connection with the People’s application to admit these items into evidence, defense counsel asked the witness whether “it would be safe to say that you are not familiar with the business practices and the generation of business records as it was in 1993?” Ms. Shaw replied, “Yes.” She also acknowledged that there were “rules of business that [were] implemented . . . eight to ten years before [she] started working [for DMV] that [she] was not aware of.” The defense objection to the admission of these documents was then sustained. No further attempt was made by the People to introduce these items into evidence, and the People sought no clarification from Ms. Shaw about the obvious discrepancy in her testimony about her familiarity with the business practices at the DMV involving the mailing of suspension orders in the early 1990s.
The defense argues that the People have failed to make out a prima facie case that the defendant knew or should have known of the 1992 suspension order based on Ms. Shaw’s admission that she was not familiar with the business practices of the Department of Motor Vehicles in 1993. Ms. Shaw’s testimony on this point, even reading the record in the light most favorable to the People, is muddy at best. However, as already noted, it is well-settled that a court should base a decision on a motion for a trial order of dismissal “without consideration of questions as to the quality or weight of the evidence.” (People v Simon, 157 AD2d 508, 512 [1st Dept 1990].) Here, as troubling as the conflicting testimony may be, the fact remains that there is sufficient evidence on the *831 record to support a finding that the 1992 order had been mailed to the defendant, only in terms of finding that the People satisfied their requirement to make out a prima facie case.[4] As even the defendant seems to concede, Ms. Shaw’s conflicting testimony presents a question of weight. Indeed, one of the reasons suggested in Pacer (6 NY3d at 512), that live testimony versus a prepared affidavit is necessary to protect a defendant’s right of confrontation, is so a defendant can inquire whether the witness can “testify reliably about [mailing] procedures as they existed” at the time the suspension order was generated. So, even if Ms. Shaw’s initial testimony that it was her belief that the 1992 order had been mailed in accordance with business practices then in effect would be entitled to be given very little weight and would not be sufficient to support a verdict of guilt beyond a reasonable doubt, that fact can play no role in a determination of this motion. (People v Vasquez, 142 AD2d 698, 701 [2d Dept 1988].)
Even if Ms. Shaw’s testimony were legally insufficient to establish the “knowledge” element, there is additional circumstantial evidence to demonstrate that the defendant knew that his privilege to drive a motor vehicle in New York State and his privilege to obtain a valid license from New York State had been suspended or revoked. (See generally People v Foskey, 190 AD2d 638 [1st Dept 1993].) The defendant’s obtaining a presumably *832 valid. New York license using a different name, Eddie Melendez, then trading that license in for a Pennsylvania license, and then obtaining another New York license based on the Pennsylvania license obtained using the Melendez driver’s license demonstrates, circumstantially, that the defendant was aware that his New York State driver’s license and/or his driving privileges had been suspended or revoked. As Ms. Shaw testified, if a person changes his or her name with DMV or even alters the spelling of the name, New York State will issue a new driver’s license under the different name even if the licensee’s privileges were in fact revoked at the time. New “client identification numbers” are generated and a new license is issued using that client identification number in that case and a new DMV file is created. This file will be kept separate from the file containing information relating to the previously issued license. The fact that a motorist is using a different name is not caught unless the “image captures” from different applications are compared, and then the DMV driving records relating to each of the licenses are merged under a single client number.
The defendant’s images from two separate drivers license applications were admitted into evidence, and are referenced by date to applications listed on the driving abstract. It is clear from the testimony and all the information in the driving abstract that the court is dealing with a merged record. The defendant’s actions, read in the light most favorable to the People, are legally sufficient to show that he knew or should have known that his New York State driver’s license was suspended or revoked when he made his 2001 and 2004 applications to the DMV The defendant’s use of different names to obtain driver’s licenses in New York, and using out-of-state driver’s licenses to obtain them, especially given the extraordinary number of traffic tickets he received according to the abstract in evidence, demonstrate an intent to defraud the state in order to obtain a New York license,[5] and it is perfectly reasonable for this court to draw the inference that he did so because he knew his New York State driving privileges had been suspended or revoked based on unpaid tickets *833 issued prior to those dates, and that he was unable to obtain a New York State license without employing deceptive means. (Cf. People v Asaro, 94 NY2d 792, 793 [1999].) The fact that the defendant apparently had a fraudulently obtained license, that appeared valid on its face, in his possession at the time of his arrest does not negate this inference.
Given all of this, there is sufficient evidence to make out a prima facie case of a violation of Vehicle and Traffic Law § 511 (2) (a) (iv). The evidence, taken as a whole, is legally sufficient to show that the defendant was operating a motor vehicle while knowing or having reason to know that his license or privilege of doing so had been suspended or revoked, and that he had in effect three or more suspensions imposed on three or more dates for failure to answer, appear or pay a fine. For this reason, the motion to dismiss pursuant to CPL 290.10 (1) is denied.

. At the present time, there is no approved instruction for Vehicle and Traffic Law § 511 (2) (a) (iv).

. This decision is not intended to he read as a statement of what elements are required for the commission of Vehicle and Traffic Law § 511 (3) (a) (ii), or whether the criminal jury instruction for that charge is correct.

. The People called a witness, who was the defendant’s parole officer in December 1992, and he confirmed that the address listed on the notice of suspension was in fact the defendant’s address at that time. His name was also Eddie Abelo.

. The legislative memorandum from the State Department of Motor Vehicles in support of the bill which became Vehicle and Traffic Law § 214 notes that
“when a revocation order has been generated by the department and is placed in the motorist’s license or revocation file, that notice goes through a specific procedure which results in the mailing of that notice. The mere listing of the revocation or suspension on the file is, in actuality, . . . proof of mailing” (1987 McKinney’s Session Laws of NY, at 2543).
In Vehicle and Traffic Law § 214, the Legislature provided that introduction into evidence of a notice or order of suspension together with a notice of entry and an affidavit by an employee of the DMV “setting forth the procedure for issuance and the mailing of such notice . . . shall be presumptive evidence that such notice . . . was produced and mailed in accordance with such procedures.” The People urge this court to use “common sense” and find that the “business practices of the Department are the same as they were in 1992 and beyond” and that the notice of suspension was actually mailed. Given the fact that the Legislature has already determined that, legally, the People need to demonstrate what business practices were in place at a particular time to establish a “presumption” of knowledge, and the Court of Appeals determination in Pacer that such a demonstration can be accomplished only through testimony of a live witness, this court can make no such finding.

. The defendant’s actions may also indicate that he knowingly offered a false instrument for filing with the DMV thereby violating not only Penal Law § 175.30, but also Vehicle and Traffic Law § 392. (See People v Briggins, 50 NY2d 302, 305 [1980] [application for driver’s license is a “written instrument”].) This would also support the inference that he knew or should have known that his license was suspended.